So Mr. Lynch, whenever you're ready. Thank you, Your Honor. May it please the court, I'm Phil Lynch, and I'm here today for Les Burke. We have two issues as regards to why the convictions should not stand. The first is the sufficiency of the evidence on the specific intent to cheat. The second, and related, is that the erroneous jury instruction on specific intent that was given by the district court in light of the shakiness of the evidence in this case, even if you think it's sufficient, requires reversal. Mr. Burke didn't have a specific intent to cheat his customers. There is plentiful evidence of that. Things went wrong, but this was not, as the government's theory was, a false business of saying you build container homes. There was plentiful evidence from both the government's witnesses and from the defense witnesses that this was an ongoing facility that was involved in this business. It may not have been the most efficient or good facility in the world, but it was there. We heard that, if I could just run through some witnesses to show, because I think it's very important, because cheat's a big thing, right? Cheat. When you enter those contracts, you intended to cheat. I don't think they showed that. Well, suppose the evidence showed, and I think it does, but let's just assume the evidence shows that Mr. Burke was showing people false photographs of containers in order to get them into a contract for a container. Now, he says, OK, yeah, but I did something false. I made a false representation, but it wasn't in order to cheat, because I intended to get them a container. Now, why isn't it, though, showing someone something false, and with the intent that they enter into a contract and give you some money, why isn't that enough in and of itself, regardless of whether he intended to give them the containers down the road? Well, because the element of the offense, Your Honor, the third element is the specific intent to deceive and cheat. Well, I showed him a picture that's deceptive. It wasn't a real picture. And my intent was to get them to give me some money. Why isn't that enough? That's the first element. It's not enough, Your Honor, because they didn't prove all three elements. Well, I know. I'm asking you about that. Why isn't that enough to show he wanted to deceive them to get them to give him some money? Because getting them to give them some money in return for a container home is not a crime. If his intent is simply to take the money, that would be proof of cheating. But all of the evidence shows that he had a real business. Did he? Well, that would mean if I had a real business, if I had a real business, I could do anything on the front end. I could show them false pictures. I could make false representations about whether I had FEMA contracts or what have you. And as long as I have an ongoing business, it's not fraud. I'm not saying that, Your Honor. I'm saying that that may be sufficient to prove the first element. And that may leave you liable to enforcement by a city, state, or even the federal government if you're violating rules that have been published about accurate advertising. But that doesn't show the third element of wire fraud. So it's never wire fraud. If I have an ongoing business, I can make whatever representations at the front end that I want, even if they're fraud, even if they're false. But I'm never going to be liable for wire fraud, as long as I have an ongoing business. I think to the extent you're saying that the evidence does not otherwise show an intent to cheat, that is correct. OK. In your view, there has to be some form of direct smoking gun evidence showing specific intent. A juror can't just stack a circumstantial, circumstantial, circumstantial. I believe this witness. I believe this witness. I believe this witness. But unless there's some direct smoking gun evidence of specific intent, that's not enough? I don't think I'm saying it has to always be direct smoking gun. I'm saying that in this case, the circumstances of the entire picture are not enough for a reasonable juror to conclude that there was specific intent to cheat. And this is one of those rare federal offenses that actually has a fairly strong mens rea. In most federal offenses, it's knowing, and it's sort of like, that was good enough for everybody. But specific intent to cheat. So yes, we are going to, the court is going to, and should look a little harder to see, did they prove this willful mental state? And simply saying, well, maybe the jury could have found it from something. It essentially takes that mental state out of it. You have to identify specific things. And I don't think the government did that at trial, and I don't think they've done it here. The evidence from the government's own witnesses, like Ron Britton, who worked at Atomic, was that he worked, and his colleagues worked, 40 or more hours a week. That Mr. Burke provided them with all the tools. That they did good work. And this is from a man who didn't like Les Burke. Alfred Paez, who sold Burke the container and bought a finished building that Burke built. Now, I didn't think that Burke did a very good job, but that's a different question. And it goes to the, was this really just a bad businessman who's been criminalized? There were other. Let me ask you one. Yes, Your Honor. How do you deal with the fact that the jury acquitted your client on some charges and convicted him on others? Doesn't this show that the jury didn't convict solely on his deception? That's a good question, Your Honor. And I would say that the circumstances of an individual case, it does show the jury was working at it. And I agree with that. But the fact that the jury's working at it doesn't relieve the government of its burden to prove the element. And I would say that in none of these customers did they show that they had a specific intent. To go back to Judge Willett's question, this is an ongoing business in which there are few customers who didn't get what they contracted for. I understand why they're disgruntled. I understand why they're unhappy. What I don't understand is where the government's proof of intent to cheat is. I'm not exactly sure why on Ms. Geis' counts they acquitted. We don't know that. But the question is less, what did the jury do, than could the jury have done what it did in convicting him reasonably? And I think because there isn't that evidence of specific intent. And I think, Judge Willett, to go back to your question, it's a matter of the particular case. It's not a matter, I'm not asking for a broad sweeping statement that there must be a smoking gun. But when there's this much evidence of a real ongoing business, and that comes from the government witnesses, Britton, Clayton, Jones, Tespisaro, Olson, our witnesses, their witness Gary Crossman, ours, Oscar Garcia, we signed to say he moved 50 at least of these finished containers for Mr. Burke. Yes, this business fell apart. Yes. I just don't understand the ongoing business part. Somebody can have an ongoing business and still intend to defraud with respect to that business. You can give people products from your ongoing business and then say, or a jury's entitled to say, well, he wanted to sell more than he could, so he made false representations at the front end. He showed pictures that weren't actually the containers. He said he had contracts that he really didn't have. And the jury could say, well, he went into that intending to take their money through false pretenses. I just don't understand the ongoing business part. I think it's important because of the separation that we have between Day and Burke. Burke's the manufacturing guy. Day is out there selling away, and he's very smooth and seems not to be paying much attention to anybody once he gets a signature. Les is back at the facility trying. Yes, he put up those things, and he shouldn't have. I'm not defending that. But Les is back at the facility trying to meet these contracts and to criminalize the fact that- That's a story. The jury might have believed that or not, right? Well, if the government had, I don't think, I see what you're saying, Your Honor, I don't agree with. I don't think the evidence is there that Les Burke intended to cheat anybody. I think Les Burke is just in over his head, working, doing all sorts of not very smart things to dig him a deeper hole. And that's not specific evidence of intent to deceive and cheat. And on the jury instruction, we know we have improper jury instruction. And I think what I would say, because it's on plain error, I think what I would say is, there is shakiness in this evidence, and this case is not like other cases where the court has held it's harmless, okay? In Perez Gorda, the husband and wife told blatant lies about his level of disability and her level of necessary caretaking. And there was government evidence that showed, he claimed not to be able to walk. They had a bunch of witnesses who said he's walking. She claimed she had to spend a lot of time, all the time with him, take care of him constantly. They had government witnesses who talked about her going on vacation for nine days. That, Judge Willard, is kind of circumstantial evidence, not smoking gun necessarily evidence. But that's very strong evidence. Logsdon, the unpublished case that my friend cited to the court recently, it's a Ponzi scheme. Ponzi schemes are different, I think, maybe this plays to the ongoing business, Your Honor, that a Ponzi scheme, there is no there there. Your intent from the beginning is to take that money. And that's what happened in Greenwell and Logsdon. And so since there was nothing there, it was nothing but a grab for money. They had no fund to put it in. That's different than here, where he does have a facility. He is trying to work. He fell behind, he screwed up. But criminalizing that as a federal offense and sentencing him to 20 years, I think he at least should have had a chance for the jury to decide, did we find cheat in the conjunctive? Because he's doing 20 years on this, on a wrong jury instruction, and we presume that the jury's gonna follow the instruction. If I might briefly shift to sentencing, I think that on both of the sentencing adjustments that we challenged, that the district court erred. Mr. Burke was not in a position of trust. This is not a fiduciary pretending to run an investment fund. This is not, as in the Buck case I cited, an example of someone who is the administrator of a program and gets to make discretionary decisions and is trusted by the federal government to make true statements about why the funds are needed. This is not, as I said in my reply brief, like the government wants to make it about, well, you're the boss, so therefore you abuse the trust position. But that's not what Kay and Miller say. Kay and Miller say you have to have a position, a specific responsibility to people. And so, again, licensing in the Miller case to be able to do Medicaid medical equipment, you're lying to the government, you're abusing the trust that was in union licensing. If we agreed with you on the abuse of trust, what would that do to his guideline range? Excuse me, your honor? If we agreed with you on the abuse of trust, what would it do to his guideline range? That would take it down two levels. Okay. Okay, the leadership adjustment would take it down four levels. If there was a crime, and I don't think there was, it was Les Burke, and it was Ethan Day. And here the ongoing business plays in again. Because the government's theory now is otherwise extensive. Okay? Because the government concedes correctly that these people who were doing actual work, building actual houses, were participants in a criminal enterprise. They were doing their jobs, okay? And the government concedes that they're not participants, and that's right under the guideline commentary. And so the question becomes, is it otherwise extensive? And it's not. It's, if you think the worst of it, it's a handful of contracts by two people, Day and Burke. And that would take it down, I think it should take it down four levels, your honor, because I don't think there's any leadership here. I'll point out to the court that another panel sustained a two-level adjustment from Mr. Day, but they did so under what I think is an incorrect reading of participants. And so I would urge the court to look at the commentary on that and find that these people were not participants. They were actually doing legitimate work for customers who got their products. I have nothing at this moment, your honor. Thank you. Thank you, Mr. Lynch. We'll now hear from Mr. Durbin, representing the United States. Welcome. Thank you. Good afternoon, your honors. Richard Durbin for the United States. I'll start with the sufficiency issue. I see it differently. And I don't think that the sufficiency issue requires proof that the entire business was bad. I think that this court has seen a lot of cases where a business starts to go bad and a fraud develops basically on the belief that, well, if we can just get through this rough patch, we'll lie for a while, we'll cheat, we do it with loans, we do it with all kinds of things. That is a fraud, even though they were at some time operating a legitimate business. It was very common in bank savings and loans about 35 years ago. But there's more in this one. There is a lot of evidence, I think, of specific intent to defraud. And one of the things I would direct the court's attention to is an email between Day and Burke fairly early on in November of 2015. It's Government Exhibit GX01407. And in that email, they're discussing cash flow problems. Very early on, they have cash flow problems. It's very shortly after, I believe, they've had an agreement with one of the victims that testified. And they're talking about, we should collect money before we move on with the bills. We'll have 200,000 in sales to help with the cash flow. And so they were having difficulties very early on. They were making representations thereafter to customers that they were going to build within 90 days, build within six weeks, whatever the representations were. And they knew full well that their business was not a model that was working. Then it went beyond that. There were additional emails. There were discussions, the GX01409, about putting false reviews, favorable reviews on a website because they were having difficulties with customers who were complaining. They specifically removed the name Atomic from the name of the company, Atomic Container Corporation, whatever it was. They didn't change the practice. They didn't change their practice of keeping the money, of putting people off, of not producing the containers. They changed their names. They also talked about filing lawsuits against disgruntled employees, not people necessarily who had illegitimate beefs, but as a way to intimidate them. Even one of their own employees, Kelsey McMaster, said she was a marketer for them, and she became uncomfortable because she recognized there was a pattern of deals falling through, and a lot of excuses and blaming clients. In those circumstances. Mr. Durbin, Mr. Lynch, I think makes a forceful argument that what you're talking about is intent to deceive. These are, well, this is evidence of deception, no doubt, but it doesn't get you from there to the cheating that is also required. What is your response to that? Well, I think these circumstances do get to the cheat because what they're doing is entering contracts claiming that they're going to be able to sell these things and produce these things to these people, and they don't do it, and they know from their pattern, because this goes on for several years through a series of clients, that they're not doing it. Now, there's all kinds of excuses for why they're not doing it, because there may be problems with foundation or problems with the land and so forth, but they go into these agreements at the outset representing they can do this for a fixed sum or for a certain amount, and then when they can't do it, they blow off the customers, they ghost them, they find excuses for not getting back to them, and they continue to operate this, and I think the only reasonable inference from this is they know what they're doing, and they're doing it to cheat people, and they're doing it to line their pockets, and some of the additional evidence of that includes misrepresentations on the website about multiple government contracts, misrepresentations about how great they are with working on major housing developments, false affiliations with reputable companies showing that they were with Grainger Red Book, with CropBox, they were building restaurants for Checkers restaurants, repeatedly putting up photos of others' products representing that they were their own photos. They did it not only on the website, but they did that over and over again with clients who were asking what's the status, what's the progress, who had heard nothing. There were other misrepresentations. If someone makes those false representations just to get somebody in the door, so to speak, to get a contract with them, intending all the while to follow through on it, or at least hoping to be able to follow through on it, is that enough to show intent to cheat? They did it once, Judge, I think not, but they did it over and over and over again over a period of time with different clients, and I think you can reasonably, and the jury could reasonably infer from that, they knew what they were doing, and they were cheating these people, and they knew going into these contracts that if they weren't going to perform, they were gonna cheat these people out of their money. They were gonna stop talking to them, they were not gonna make refunds, and they didn't make refunds. And in addition, I think you have to look at what their financial arrangements were, because this was a strange sort of way to do your finances. There were business accounts, but there were no salaries that were specifically paid. Everything was done in cash. There was a fairly illustrative set of transactions that occurred in October of 2015 with Cynthia Miller, and when she entered the contract, she wired $30,000 today, to Codefendant Day. He then proceeded to wire $20,000 to Burke's business accounts, and from his own accounts, he took withdrawals to pay Verizon Wireless, Forever Flawless Cosmetics, a gas station, Airbnb, Holiday Inn, all kinds of personal expenditures. The money that went into Burke's account did not go to paying, well, a small amount went to paying business expenses, but much of it went to McDonald's, Blake's, a lot of burgers, Cinemark Theaters, Taco Bell, Sam's Club, and on it goes, all personal expenditures. This clearly demonstrated that they were in it for the money. They weren't in it to make the business work. They weren't in it necessarily to make these people whole, and in fact, they went out of their way not to make people whole, and to make it even more evident, more obvious, throughout the course of this, Burke changed the name of the companies twice. He changed it from Atomic to American to Universal. When the FBI got a hold of his accounts, he got Ileana Velasquez to open up Universal Container and Container Homes, and she had a bank account, again, which he was directing payments to go into and out of, all cash payments. In addition to that, their treatment of their customers, they intimidated them, they threatened them, they physically intimidated them. If they visited the premises, they made false statements about why they shouldn't be on the warehouse premises, because they had, quote, secret government contracts, which was not true, and so if you take a look, I think, at those circumstances, that's pretty overwhelming evidence of deceit, intent to cheat, a pattern of cheating, and then when it all falls apart, Burke takes the additional step of having purchased vehicles under the name of one of the latest iterations of his company in the loan application. He then lies to the bankruptcy court about those vehicles. He omits them from the statement of assets that he has, because he wants, and those are proceeds, by the way, of the fraud scheme, and so he's continuing now this fraud scheme, he's clearly doing this with the intent to cheat. Anybody who happens to come in his way. Mr. Durbin, I've got a question for you. Yes, sir. I don't hear as well as I once did. I don't either, Judge. You may have touched on this, but there was a two-level adjustment for abuse of a position of trust under the sentencing guidelines by the district court. Did it err in doing so? I don't think so, Judge, and the reason I think that is because the position of trust looks to two factors. One, a position of a professional or managerial possession with discretion in that area, and the judgments are given substantial deference, and there is significantly less supervision over that person. And doesn't every business owner have managerial discretion? I don't know if it's every business owner, but if you look at the cases that we cited, the Miller case and the Kaye case, and the case that Mr. Lynch cited, the Buck case, those were all CEO, president, manager owners of those corporations. So was Mr. Burke. And I read the commentary of the guideline to say, look, it doesn't apply to your ordinary salesman. It doesn't apply to the car lot salesman, but Mr. Burke is the owner, operator, manager. He controls everything. What about somebody who owns their own plumbing company, electrical company, interior design company? It's just them. They're just sort of a tradesman. They're just a contractor, and say they defraud their customer. Do they all hold positions of trust over their customers? On those bare facts, probably not. But the facts of this case, I think, put Mr. Burke in a substantially different position. He's the owner. He runs the finances. He offers stock. He offers stock in exchange for disgruntled customers as compensation. He offers stock to employees. He offers stock on the internet. Those are the types of circumstances that the court has looked at. Are there cases out there that upheld this adjustment when there wasn't either somebody with a fiduciary duty or a fraud against the government? Has that adjustment ever been applied and upheld outside of those two facts? Either where there was no fiduciary duty and no fraud committed against the government itself? I can't make a representation. I don't know. But I know that in the case of, I believe it was Kay, it was the president of the corporation that made bribe payments to Haiti. He didn't have a fiduciary relationship with the government of Haiti or Haitian officials, but this court said that notwithstanding that, that was an abuse of a position of trust. I mean, the comments to, was it 3-1-B-3? The comments, they provide examples that don't really map perfectly onto the facts of this case, but they do talk about people who are in positions of trust, like pilots, lawyers, doctors, demolition experts, people like that. Right. There is ambiguity in that. I'm not gonna suggest that it's entirely clear, but I think under this circumstance, if you look to those factors, plus the factor of, did the position contribute to and help facilitate the commission of the offense and to conceal it? And he was uniquely positioned in this enterprise and in this operation to control the whole thing. As the district court said, he could make representations to the customers and they were unable, they weren't capable of finding out the information of whether or not they were accurate, to find out whether things are correct. And in fact, when they came to visit, he would intimidate them. He would throw them off the property. He would threaten them with calling the FBI on them, in at least one circumstance. So this is a close case. I'm not gonna say that it's clear cut, but I think as the court has applied this, the circumstances are that the position facilitated commission of these crimes, and he had maximum discretion in this, and there was no oversight over it. So I don't think that it was a clear misapplication of the guidelines by the district court. Let me go real quickly to leadership. Got about six minutes left. On the sentencing, yes, we argue that the enterprise was otherwise extensive, and I say that for these reasons. First, there were multiple persons that were involved in carrying this out, although they didn't necessarily have criminal culpability. It included Day, who did have criminal liability. Dawn Clayton, who was labeled as an architect, when in fact she was not. Ray Collins, the vice president, who went over to Houston and worked on, I believe it was Rao's property, to put in foundation. Diana Burke, his wife, who was labeled as an executive of Quantum Stealth, one of the other companies that Mr. Burke used, that she had held that position for 13 years. Quantum Stealth hadn't existed for 13 years at the time of that. Kelly McMaster, I mentioned, was the marketer. David Almaraz was his stepson, who he put in charge of another corporation. Ileana Velasquez, a marketer at Universal and a banker, as well as Robert Britton, the welder, who testified that they were not plumbers. He was having to do plumbing work. It wasn't good work, and Mr. Burke's answer to him was, well, just put the floor over it, nobody's going to see it. There were multiple entities, atomic container homes, American container homes, Universal, Quantum Stealth, and atomic home designs. They used multiple entities to carry out this scheme. Multiple victims, maybe as many as 40. There was a large loss, as much as $2.5 million. There were multiple locations. This ranged from Texas to California to Washington to Colorado to Arizona. He used the bankruptcy court scheme, and he used multiple bank accounts to accomplish this. I think that would qualify this as an otherwise extensive scheme that would support the adjustment for four levels. And there's a note that, I guess, tries to flush out that adjustment that says, to be a participant, the person must be, quote, criminally responsible for the commission, unquote. So all the people that you discuss on page 74 of your brief, is it the government's position that all those people were somehow criminally responsible in the language of the note for the fraud that was committed here? No, sir, no, sir. The criminal participants, so far as the evidence shows, as far as I read it, it's two, it's Mr. Burke and Mr. Day, that this applies only if it's otherwise extensive because there were other people that were used by him in the course of executing the scheme, carrying out the scheme. So it's not based on participants, and I don't believe, apart from Day, that any of those could be characterized as having criminal involvement. As to the jury instruction, as I read the court's precedents and green law, Mr. Burke has to show that without objection, that the error makes the difference between conviction and acquittal, and where there is substantial evidence of the cheat, as there is here, he doesn't make that showing. It must have made the difference. He's gotta show at least a reasonable probability that he would have been convicted if the jury had been so instructed. And as we argue in the brief, I think there was ample information, ample information in the record that shows the jury squarely addressed the issue of cheating. It was the crux of the defense argument in closing. It was the focus of the government's argument in closing. The court's own instruction included instruction about intent to operate a scheme to deprive another of property. And under those circumstances, given what the parties actually argued about, what the court directed them to, and the substantial evidence of fraud, I submit to the court that any error in the instruction was harmless. And to close, I would just go back to finally the matter of Mr. Burke and Mr. Day were otherwise operating a legitimate business. That's not really what the issue is. The issue is did he execute a fraud to, a scheme to defraud, did he defraud these people who testified at trial? And I think the evidence squarely shows it. I'd suggest, I don't know if the metaphor is apt, but even a sleeping dog will sometimes trip up a burglar. And Mr. Burke clearly cheated and defrauded the people who testified against him at trial, regardless of what his intentions might have been to provide service or provide products to others. And his convictions should be affirmed as well as the sentences. Okay. If you have questions, I'll sit down. Mr. Durbin, thank you very much. Thank you all. Mr. Lynch, we'll see you back on rebuttal for five minutes. If I have that much, Your Honor. You're right ahead. I think that to just go through a couple of quick things, the contract that they used said that construction would be within, and it wasn't, I don't think, ever as early as six weeks. It was like 90 to 120 days after permitting and citing things were the fact that some people, memory may have been, the contract said this, like Ms. Wade looked at it and said, oh no, that was actually later. And she also said that about who bore the foundation cost. So some of, I understand these people are disgruntled, but some of the disgruntlement wasn't borne out by the evidence. There was, so I would dispute that there was, everything was cheating. It simply wasn't. And cheat, I think this really goes to the instruction. I don't think the evidence is sufficient, but I think this really goes to the instruction. Juries are presumed to follow the court's instruction. And what did the court tell them in this case? You have to have an intent to deceive or cheat. Cheat is a powerful word. And when someone puts deceive or cheat in the disjunctive, I think most human beings, reasonable human beings, especially since Judge Duncan's right, there are things that aren't true on that website, they're gonna choose, let's pick deceive. Because cheat, that's a big word, especially in the context. I disagree with my friend. I think the overall context is important. This is a handful of contracts. It's made to look bigger because there were a couple wire transfers in some of the cases. But we're talking about eight or nine contracts. In the context of evidence, that we know that Louie Sines tells us he's moved at least 50 buildings. We know that Alfredo Paez tells us that Mr. Burke has bought a number of containers from him, and he personally knows that Mr. Burke did the building for him, and he personally knows that Burke was buying containers from other people. And so it's much easier if the court says, hey, you only have to make a choice. And that's what the court told them in this case. And juries are presumed to follow their instructions. And I think for Mr. Burke to sit in prison for 20 years, good man, maybe it's close enough, that maybe the jury did this, I think that's wrong. I think he deserves under the Fifth and Sixth Amendment a chance to have a jury decide whether he deceived and cheated. So we would ask, at the very least, that you reverse for a new trial if you don't reverse for insufficient evidence. Let me ask you this. Yes, Your Honor. Apart from guilt or innocence. Yes. If we agree that he was guilty, let's go to the sentence. What do you say about the two-level or just for abusive position of trust under the sentencing guidelines? I don't think there's a trust position here. I mean, essentially, they're saying every time you make a commercial deal with a business person, that business person is in a trust relationship with you. I think that's not true. That's not what the guidelines mean by trust relationship. They mean a fiduciary type thing, including a number of the professionals that Judge Willett listed. They also specifically say they mean an employment relationship. This is not an employment relationship. This is a commercial contract. I could offend him not honoring and fulfilling his contract, but that doesn't put them in a trust relationship. That's what we have contract law for. If we agreed with you on the two-level abusive trust adjustment, what would that do to the bottom line sentence? I'm trying to think. It was 235, so I think it would take it down to 210 is my sort of memory of. Do you have anything else to add on the four-level leadership adjustment? I'm sorry? Do you have anything else to add on the four-level leadership adjustment? Well, I think one, I'd ask the court direct, not direct, I don't direct you, sorry. I would invite the court to look at the Fullwood case because I think this falls below what Fullwood said is probably the bottom of, and you don't want to use otherwise extensive, which I don't think this was, to end run participants. Thank you, Your Honor. Okay, thank you, Mr. Lynch. And the court notes that, yes, sir? Is that right? I only showed 20 on my paper, but if you have anything else to add, feel free. He got 20 years on the wire fraud. Oh, I'm sorry, I thought you meant how much time he got at the podium. I'm like, no, I think it's 20. Okay, okay. No, we're used enough to each other. We wouldn't do that ever to each other. Thank you. He did, he got five consecutive on the bankruptcy. Okay. So, 20 on the. Very good. Well, Mr. Lynch, the court notes that you're court appointed, correct? All right, well, we thank you for your advocacy. We appreciate it. Mr. Burke is well represented. And with that, the case is submitted. We thank you both.